# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

ALBERTO GUERRERO,

    *Petitioner*,

vs.

JAMES SCHOMIG, *et al.*,

    *Respondents*.

2:04-cv-00454-KJD-GWF

ORDER

This habeas matter under 28 U.S.C. § 2254 comes before the Court for decision on the merits and further on petitioner's motion (#17) for submission of the case. Petitioner raises primarily claims of alleged ineffective assistance by his trial counsel.

### Background

Petitioner Alberto Guerrero seeks to set aside his 1998 Nevada state court conviction, pursuant to a jury verdict, for first degree murder with the use of a deadly weapon, conspiracy to commit murder, and embezzlement of a vehicle. Petitioner was sentenced on the conviction for first degree murder with the use of a deadly weapon to two consecutive life sentences with minimum parole eligibility at twenty years on each sentence. He was sentenced to term sentences on the remaining two charges, to run concurrently with the life sentences and with each other.

Alberto Guerrero was tried together with his father, Rudiberto Guerrero.[1]  On their consolidated direct appeals, in response to the father's challenge to the sufficiency of the evidence against him, the Supreme Court of Nevada summarized the evidence arrayed against the co-defendants as follows:

> [D]uring a social gathering at the residence of Rudiberto and Alberto, the victim, Manuel Monpie, became involved in a disagreement with Alberto, involving the breaking of each other's cassette tapes.  Monpie and his girlfriend, Elsa Dacosta, left the party in their van and returned to their own residence, which was approximately a fifteen-to-twenty-minute driving distance from the Guerrero residence.  Both Rudiberto and Alberto were at the Guerrero residence when Monpie and Dacosta departed.
>
> After Monpie and Dacosta arrived at their own residence, Alberto drove his car up to the front of the residence and parked it.  He approached Monpie as Dacosta entered the residence.  Dacosta began speaking with her twenty-one-year-old daughter, Maria Maldonado, and heard a bang.  Maldonado testified that she looked out a window and saw Alberto shooting a handgun in the direction of Dacosta's van.  At that point, Maldonado saw Rudiberto drive his truck up to the scene and park it behind Alberto's car.  Rudiberto got out and walked toward Alberto's location with a shotgun and began firing the gun in the same direction as Alberto had fired his weapon.  Maldonado and Dacosta ran outside, and Rudiberto went toward his truck telling Alberto, "vamanos."  Alberto stood and looked at the two women, and then he and Rudiberto left the scene in their own vehicles.  Maldonado and Dacosta found Monpie lying on the ground and bleeding.  Police and an ambulance crew arrived shortly thereafter and determined that Monpie was dead.  No evidence indicated that Monpie was armed at the time he was fatally wounded.
>
> Approximately two hours after the crime, police established surveillance at the Guerrero residence and found Alberto's car parked outside the residence.  Rudiberto's truck was seen arriving at the residence between fifteen to thirty minutes later.  Five minutes after that, Rudiberto exited the residence and was arrested; Alberto was not found at that time.  When Rudiberto was booked into jail, police recovered three shotgun shells from his pocket.  Evidence also indicated that Alberto fled Nevada after borrowing a car from an acquaintance of his.
>
> An autopsy revealed that Monpie had been shot in the head by a shotgun and had been shot in the shoulder, back, chest and forearm by a weapon consistent with a .22 caliber

---

[1]The Court denied the son's habeas petition in *Rudiberto Guerrero v. Schomig*, No. 2:04-cv-00453-KJD-RJJ; and the Court of Appeals denied a certificate of appealability.

1    weapon.  The cause of death was determined to be the shotgun
2    wounds to the head.  One of the shotgun shells recovered when
     Rudiberto was booked into jail contained ammunition consistent
3    with that recovered from Monpie's head.   A .22 caliber bullet
     recovered from Monpie's body was determined to have been fired
4    from a handgun which was registered to Alberto and found by
     police in Rudiberto's truck subsequent to this arrest.

5    *November 18, 2001, Order of Affirmance*, at 2-3 (filed with #12).  The Court previously

6    reviewed the underlying trial transcript in considering Rudiberto Guerrero's petition, and the

7    foregoing description is an accurate summary of the evidence at trial.[2]

8                                    ***Governing Law***

9           The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

10   deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 521 U.S. 320, 333

11   n. 7, 117 S.Ct. 2059, 2066 n.7,138 L.Ed.2d 481 (1997).  Under this deferential standard of

12   review, a federal court may not grant habeas relief merely on the basis that a state court

13   decision was incorrect or erroneous.  *E.g., Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir.

14   2003).  Instead, under 28 U.S.C. § 2254(d), the federal court may grant habeas relief only if

15   the decision: (1) was either contrary to or involved an unreasonable application of clearly

16   established federal law as determined by the United States Supreme Court; or (2) was based

17   on an unreasonable determination of the facts in light of the evidence presented at the state

18   court proceeding.  *E.g.*, *Mitchell v. Esparza*, 124 S.Ct. 7,10 (2003).

19          A state court decision is "contrary to" law clearly established by the Supreme Court only

20   if it applies a rule that contradicts the governing law set forth in Supreme Court case law or

21   if the decision confronts a set of facts that are materially indistinguishable from a Supreme

22   Court decision and nevertheless arrives at a different result.  *E.g., Mitchell,* 124 S.Ct. at 10.

23   A state court decision is not contrary to established federal law merely because it does not

24   cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has held that a state court

25   need not even be aware of its precedents, so long as neither the reasoning nor the result of

26

27   _____

28   [2]See No. 2:04-cv-00453-KJD-RJJ, ##14 & 15.  The Court will direct the Clerk to file a copy of these
     exhibits in the record in this matter so that the trial transcripts will be of record herein as well.

1    its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court

2    for simply holding a view different from its own, when the precedent from [the Supreme] Court

3    is, at best, ambiguous." *Mitchell*, 124 S.Ct. at 11. For, at bottom, a decision that does not

4    conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly

5    established federal law.

6        A state district court decision constitutes an "unreasonable application" of clearly

7    established federal law only if it is demonstrated that the state court's application of Supreme

8    Court precedent to the facts of the case was not only incorrect but "objectively unreasonable."

9    *E.g., Mitchell*, 124 S.Ct. at 12; *Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir. 2003).

10        To the extent that the state court's factual findings are challenged intrinsically based

11    upon evidence in the state court record, the "unreasonable determination of fact" clause of

12    Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d

13    943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly

14    deferential" to state court factual determinations. *Id*. The governing standard is not satisfied

15    by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973.

16    Rather, the AEDPA requires substantially more deference:

17            . . . . [I]n concluding that a state-court finding is unsupported by
              substantial evidence in the state-court record, it is not enough that
18            we would reverse in similar circumstances if this were an appeal
              from a district court decision. Rather, we must be convinced that
19            an appellate panel, applying the normal standards of appellate
              review, could not reasonably conclude that the finding is
20            supported by the record.

21    *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972. If

22    the state court factual findings withstand intrinsic review under this deferential standard, they

23    then are clothed in a presumption of correctness under 28 U.S.C. § 2254(e)(1); and they may

24    be overturned based on new evidence offered for the first time in federal court, if other

25    procedural prerequisites are met, only on clear and convincing proof. 393 F.3d at 972.

26        On a claim for ineffective assistance of counsel, the petitioner must satisfy the two-

27    pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674

28    (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard

of reasonableness; and (2) counsel's defective performance resulted in actual prejudice.  On the performance prong, the question is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from counsel's perspective at the time. In this regard, the reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct.  On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief.  *Davis*, 333 F.3d at 991.

## Discussion

### Ground 1(a):  Alleged Concessions During Closing and Handling of Outburst

In Ground 1(a), petitioner contends:  (1) that he was denied effective assistance when his trial counsel allegedly conceded his guilt during closing argument and; (2) that he was denied due process by the state trial court's actions after he objected to counsel's closing.

Petitioner refers in particular to a portion of the closing argument where counsel acknowledged the State's evidence that the .22 caliber handgun found was registered to petitioner and that a .22 caliber bullet recovered from Monpie's body matched bullets fired from the gun.  Petitioner alleges in the petition that at this point he "leapt to his feet and shouted out his objection to this outrage."  He asserts, however, that the state trial judge admonished him, threatened to have him gagged, and then granted a motion by the State to strike Guerrero's objection from the record.  Petitioner contends that he was prejudiced by his attorney's concession of guilt, by the State's motion to strike his objection, by the trial judge's threat to have him gagged, and by the order to strike his objection from the record.

Petitioner's trial counsel was Kirk Kennedy.  In the closing argument, he attempted to raise a reasonable doubt in the jurors minds as to the existence of the requisite intent for first degree murder, the existence of a conspiracy, and the basis for aider and abettor liability on the part of Alberto Guerrero for Rudiberto Guerrero's alleged actions.

-5-

1    In the fourteen transcript pages of closing argument, Kennedy focused first on the

2  State's burden to show premeditation to establish the intent required for a conviction for first

3  degree murder.  He reviewed testimony tending to establish that Alberto Guerrero had been

4  drinking all day and that petitioner thus was intoxicated to the point that he was subject to

5  overreacting to petty things.  Counsel pointed to the disgrace that Guerrero felt when Monpie

6  stomped on Guerrero's tapes while a guest at a party in Guerroro's own home.  Kennedy

7  suggested that the disgrace was felt all the more due to Guerrero's Cuban cultural heritage.

8  Counsel then pointed out that the State had put on no evidence of what transpired between

9  Guerrero and Monpie after the initial exchange between the two outside Monpie's home, as

10 Dacosta had walked inside to speak with her daughter.  He maintained that, accordingly, the

11 evidence left to conjecture what Monpie may have said or done and how that may have

12 affected Guerrero's state of mind.[3]

13    It was at this point in his argument, that Kennedy made the acknowledgments upon

14 which Guerrero primarily bases his ineffective assistance claim:

15
16        Now we have evidence.  What can you say.  I mean the
         State puts on a good show.  They got the right people.  They
17        come in here.  This is Alberto's .22?  Yes, it is.  They got
         registration documents on it.  There's no question about that.

18        Magdalana Lukachko testified she thought this gun was
         kept in the dresser drawer.  We're not challenging that.  We know
19        from the criminalist that the bullets fired from this gun matched
         the .22 caliber bullets in the body of Manuel Monpie.  We know
20        that.

21        The question is, ladies and gentlemen, is not really so
         much how Monpie was killed but what led up to it, what caused
22        it, what was the state of mind.  It all comes back to premeditation.
         You got to have that determination to kill in order to find someone
23        guilty of first degree murder.

24 *Trial Transcript for January 16, 1998*, at 38-39.

25    After pointing to evidence that Guerrero still was drunk and was distraught hours later,

26 Kennedy then turned to the undisputed evidence that none of the shots from the .22 were

27 _____

28        [3]*Trial Transcript for January 16, 1998*, at 32-39.

1  lethal or fatal and that the sole cause of death was the shotgun blast to the head.  Counsel

2  maintained that the "real questions" were whether Guerrero conspired with his father to kill

3  Monpie and whether he aided and abetted his father in killing Monpie.[4]  On these issues, he

4  argued that there was absolutely no evidence presented by the State showing in any way that

5  Guerrero reached an agreement with or acted in concert with his father.  Kennedy argued that

6  the evidence instead showed that they left the party separately, that they arrived separately

7  at Monpie's residence and at different times, and that they then left separately and apparently

8  went different directions.  Counsel maintained that there was no evidence as to why Rudiberto

9  Guerrero showed up and no evidence that tied the two men's actions together.  He

10 concluded on these issues with the argument that "[t]heir actions are separated by time, by

11 intent, by what happened and the consequences thereof."[5]

12      In concluding the overall argument, Kennedy stated to the jurors "if you cannot tie them

13 together, if you don't believe that the State has proven that they aided and abetted each other

14 . . . and *if you believe* that indeed Alberto Guerrero took this [.22] and shot some four

15 nonlethal, very haphazard shots into the body of Manuel Monpie, then you have an alternative

16 of the crime of attempted murder."  He maintained, however, that the State had failed to prove

17 aiding and abetting, had failed to prove a conspiracy, and had failed to prove premeditation.

18 He  concluded with the point that the jury could not convict Guerrero for first degree murder

19 unless the State proved every element required for that offense.[6]

20      The trial transcript does not include any indication of any outburst or other interruption

21 during Kennedy's closing argument.

22      At the evidentiary hearing on Guerrero's state post-conviction petition, Kennedy

23 testified that he made a strategic and tactical decision to try and lessen Guerrero's culpability

24 in the eyes of they jury.  He made this decision due to, on the one hand, the strength of the

---

26  [4]*Trial Transcript for January 16, 1998*, at 39-40.

27  [5]*Id.*, at 39-43.

28  [6]*Id.*, at 43-46 (emphasis added).

State's evidence as to Guerrero's presence at the scene and his ownership of the .22 used in the shooting and, on the other hand, the fact that none of the wounds from shots fired from the .22 would have been fatal.  He did not believe that he could credibly argue to the jury in the face of the evidence presented by the State that Guerrero was totally uninvolved in any way.  He testified that the evidence presented by the State "was very damaging and was very difficult to overcome" and that he therefore was "trying to make the best of what was, indeed, a worst-case situation."  Kennedy stated that he advised Guerrero of his tactical decision at counsel table prior to the closing arguments; and he thought that he remembered "that I was sort of getting into his face and saying this is what we're going to do," that "[t]his is the strategy that we are going to have to try in this case."  While he remembered telling Guerrero his strategy for the closing, he did not have a recollection of Guerrero expressly authorizing him to do that.[7]

With regard to Guerrero's alleged outburst during the closing, Kennedy testified that "I do recall, I believe there was some objection that Mr. Guerrero noted when I was actually arguing in closing arguments."  The trial transcript reflects, however, that the exchange to which Guerrero refers, and that was recalled dimly by his trial counsel five years later, actually occurred during the penalty phase hearing, not during the guilt phase.  Guerrero jumped up during the State's rebuttal argument in the penalty phase and protested his innocence.  After removing the jury, the state trial judge allowed Guerrero to have his say.  He then instructed Guerrero, on the State's motion, that if he spoke up again during the proceeding he either would be gagged or removed from the courtroom.  Guerrero agreed that he would not say anything else.  The jury was brought back in to the courtroom, and the State concluded its rebuttal argument. From the discussion, it appears that the outburst during the penalty phase was the first and only outburst by Guerrero at trial.  Nothing was stricken from the record.[8]

/ / / /

---

[7]*Evidentiary Hearing Transcript for February 20, 2003*, at 3-7 & 23-25 (filed with #12).

[8]*Id.*, at 24-25; *Penalty Hearing Transcript for January 20, 1998,* at 25-30.

1      On Guerrero's ineffective assistance claim regarding the alleged concession of guilt,

2  the Supreme Court of Nevada held as follows on appeal from the denial of state post-

3  conviction relief:

> . . . Alberto contended that his trial counsel was ineffective for conceding his guilt during closing arguments. Alberto's trial counsel, Kirk Kennedy, testified at the evidentiary hearing on Alberto's petition that he did recall conceding to the jury during closing arguments that there may have been "some measure of culpability" on the part of Alberto in the death of the victim, Manuel Monpie. Kennedy explained that he made this concession as part of a shift in trial strategy with the hope that the jury would find Alberto guilty of the lesser charge of attempted murder, instead of murder in the first-degree. The record does not reveal that Kennedy made any express remarks conceding Alberto's guilt. Rather, during closing arguments, Kennedy repeatedly emphasized to the jury that the State failed to meet its burden of proof to convict Alberto of first-degree murder. Given the abundant and persuasive evidence of Alberto's guilt that had been presented by the State during the course of the trial, Kennedy's shift in tactical decisions was not unreasonable. Therefore, the district court did not err in denying Alberto relief on this allegation.

14  *March 25, 2004, Order of Affirmance*, at 2-3 (filed with #12)(citation footnote omitted).

15      The foregoing rejection of petitioner's ineffective assistance claim was neither contrary

16  to nor an unreasonable application of clearly established federal law as determined by

17  Supreme Court precedent, including *Strickland*. It is abundantly clear from the trial transcript

18  that counsel was trying to defeat rather than concede guilt for first degree murder, and the

19  closing argument was the product of a tactical decision by counsel. Further, there was not

20  a reasonable probability that the outcome of the trial would have been different if counsel

21  instead had attempted to base the closing on a strained argument that the State had failed

22  to establish either that Guerrero was present or that he was involved in the shooting. In terms

23  of what was reasonably probable, Guerrero faced overwhelming evidence that he was

24  engaged in a confrontation with Monpie at the very instant of the shooting and that Monpie's

25  body was riddled with multiple gunshot wounds from the .22 registered to Guerrero. If trial

26  counsel instead had based his closing on the proposition that the jury simply should ignore

27  this compelling evidence, the reasonable probability is that Guerrero still would stand

28  convicted of first degree murder. Counsel's closing argument at the very least allowed for the

-9-

1   possibility of a lesser verdict by the jury, without affirmatively conceding guilt on any charge.

2   The Nevada Supreme Court's rejection of the claim therefore was neither contrary to nor an

3   unreasonable application of clearly established federal law, with respect to either the deficient

4   performance or prejudice prong of the *Strickland* standard.[9]

5         On Guerrero's due process claim regarding the state trial court's handling of his

6   outburst, the Supreme Court of Nevada held as follows:

7           . . . Alberto contended that the district court improperly
    silenced him during closing arguments.  Alberto did not contend

8   in this allegation that either his trial or appellate counsel were
    ineffective.  As such, this allegation fell outside the scope of

9   permissible claims that may be raised by Alberto in his petition.
    Therefore, the district court did not err by denying Alberto relief on

10  this allegation.

11  *March 25, 2004, Order of Affirmance*, at 7 (filed with #12)(citation footnote omitted).  In a

12  footnote regarding the scope of post-conviction claims, the state high court cited to N.R.S.

13  34.810(1)(b)(2), which provides that the state court "shall dismiss a petition if the court

14  determines that . . . [t]he petitioner's conviction was the result of a trial and the grounds for

15  the petition could have been . . . [r]aised in a direct appeal or a prior petition for a writ of

16  habeas corpus or postconviction relief."

17        It thus would appear that Guerrero's due process claim regarding the state court's

18  handling of his outburst is subject to the defense of procedural default.  Respondents did not

19  address this claim in their answer, however; and the failure to raise the procedural default

20  affirmative defense in the answer waives the defense.  *See,e.g., Morrison v. Mahoney*, 399

21  F.3d 1042, 1045-47 (9th Cir. 2005)(the procedural default affirmative defense must be raised

22

23  _____

24      [9]*Accord Florida v. Nixon*, 543 U.S. 175, 192, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004)(when facing the
    distinct possibility of a penalty phase, it can be reasonable for defense counsel to concede guilt in a

25  guilt-phase closing argument in an attempt to "impress the jury with his candor," for purposes of building on
    that impression during the penalty phase; and a failure to obtain the defendant's express consent to the
    strategy does not automatically render counsel's performance deficient); *Yarborough v. Gentry*, 540 U.S. 1,

26  7-10, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003)(per curiam)(defense attorneys often must make strategic decisions
    as to what arguments to include in closing arguments and may choose to acknowledge the "shortcomings" of

27  their client's case in order to build credibility with the jury); *Hovey v. Ayers*, 458 F.3d 892, 905-07 (9th Cir.
    2006)(counsel's closing statements, even if properly characterized as concessions, did not constitute

28  deficient performance and further did not prejudice petitioner).

1   in the first responsive pleading in order to avoid waiver, with the answer rather than a motion

2   to dismiss constituting the first responsive pleading); *see also Vang v. Nevada*, 329 F.3d

3   1069, 1072 (9th Cir. 2003)(instead basing the waiver on the failure to raise the defense in the

4   respondents' motion to dismiss).  The Court accordingly reviews the due process claim *de*

5   *novo* on the merits, because there is no state decision on the merits to review under the

6   deferential AEDPA standard of review.  *See,e.g., Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th

7   Cir. 2005), *cert. denied*, ___ U.S. ___, 126 S.Ct. 2023, 164 L.Ed.2d 780 (2006).

8        On the merits, at the outset, the trial transcript reflects that Guerrero's outburst

9   occurred during the State's penalty phase closing argument, not during his counsel's guilt

10  phase closing arguments.  The state court's handling of the outburst therefore could not have

11  prejudiced Guerrero.  The guilt phase already had been concluded, so he could sustain no

12  prejudice in that regard.  In the penalty phase, Guerrero received the sentence sought by the

13  defense, life with the possibility of parole after forty years rather than life without the possibility

14  of parole.  So the handling of the outburst clearly did not prejudice him in that proceeding.

15       In any event, regardless of whether the outburst occurred during the penalty phase or

16  instead in the guilt phase, Guerrero's allegations regarding the state district court's handling

17  of his outburst fail to state a constitutional due process violation.  It is not a due process

18  violation for a trial judge to threaten to gag or remove a represented defendant if he continues

19  to make outbursts at trial.  As Justice Black wrote for the Court in *Illinois v. Allen*, 397 U.S.

20  337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970):

21           It is essential to the proper administration of criminal justice
         that dignity, order, and decorum be the hallmarks of all court
22       proceedings in our country. The flagrant disregard in the
         courtroom of elementary standards of proper conduct should not
23       and cannot be tolerated. We believe trial judges confronted with
         disruptive, contumacious, stubbornly defiant defendants must be
24       given sufficient discretion to meet the circumstances of each
         case. No one formula for maintaining the appropriate courtroom
25       atmosphere will be best in all situations. We think there are at
         least three constitutionally permissible ways for a trial judge to
26       handle an obstreperous defendant . . . : (1) bind and gag him,
         thereby keeping him present; (2) cite him for contempt; (3) take
27       him out of the courtroom until he promises to conduct himself
         properly.

28

-11-

397 U.S. at 343-44, 90 S.Ct. at 1061.  The state trial judge's threat to do exactly what the Supreme Court has held is "constitutionally permissible" if Guerrero continued to interrupt the proceedings indisputably does not give rise to a due process violation.  Guerrero has cited no apposite case law establishing that the state trial court's handling of his outburst in the manner that he alleges violated due process in any respect.[10]

Ground 1(a) accordingly does not provide a basis for federal habeas relief, on either the ineffective assistance or due process claim asserted therein.

### Ground 1(b):  Alleged Failure to Investigate

In Ground 1(b), petitioner contends that he was denied effective assistance of counsel because his counsel failed to investigate evidence to support the following:

> Both Alberto and Rudiberto protested their innocence during and after their arrest to their lawyers.  Each told essentially the same story: that they **did** go to the victim's home, not to murder him, but rather to be sure that Monpie, the victim, who left the party in a rage, did not harm his children or their mother who left with him.  When Alberto and Rudiberto got to the residence in separate vehicles, both watched in horror as Monpie was shot down in a drive-by shooting from a white automobile, that sped away as Monpie fell to the ground fatally shot by unknown assailants.  The victim, Monpie, had been a member of a violent and notorious street gang, as a result he had many enemies.  On the night that he was shot and killed he was carrying a handgun which was never found after [the police] arrived – a handgun which he used to return fire.  At the first gunshot Alberto and Rudiberto ran off fearing for their lives. . . . [N]one of this information was ever placed before the jury, because none of this crucial defense information was ever investigated by either counsel . . . .

#8, at 3(d)-3(e)  (bold emphasis in original).  Petitioner alleges that "[c]ounsel failed to investigate the victim's propensity for violence, failed to interview neighbors who witnesse[d] the drive-by shooting, failed to discover their value for trial, [and] failed to establish the impact their live testimony would have on the jury."  *Id.*, at 3(e).

_____

[10]In an affidavit filed after the respondents' answer in this matter, petitioner conceded that the state trial judge removed the jury before telling him that he would be gagged and restrained if he made another outburst.  See *August 25, 2004, Affidavit of Alberto Guerrero*, ¶ 2 (filed with #15).  A habeas petitioner generally may not present new evidence for the first time in federal court.  *See* 28 U.S.C. § 2254(e)(2).  Any concessions made therein are binding on the petitioner, however.

1    Petitioner thus maintains that if trial counsel, *inter alia*, had interviewed Monpie's

2    neighbors, counsel would have uncovered eyewitness testimony that Monpie was killed in a

3    drive-by shooting by gunshots fired from a passing white automobile.  According to petitioner's

4    account, this alleged drive-by shooting by the unknown assailants in the mystery white vehicle

5    necessarily would have occurred while the Guerreros were present at the scene, as they

6    allegedly "watched in horror" as Monpie was gunned down in front of them.

7    The petitioner's account stands in marked contrast to the testimony actually presented

8    at trial by two of Monpie's neighbors, Charles Miller and Jose Bustillos.

9    The testimony of Monpie's girlfriend, Elsa Dacosta, and her daughter, Maria

10   Maldonado, provides relevant context for the testimony by Miller and Bustillos.

11   According to Dacosta, Alberto Guerrero drove a small gray compact or sports car and

12   his father Rudiberto drove a small red truck.  On the evening in question, as Monpie and

13   Dacosta were arriving at the residence, Alberto Guerrero drove up in his gray car and started

14   speaking to Monpie.  Dacosta entered the house and started talking with Maldonado.

15   Dacosta then heard three popping sounds like gunshots and her daughter started screaming.

16   Dacosta heard another vehicle pull up and park very quickly in front of the house, followed

17   by much louder booming gunshot sound.  When she ran outside, she saw Alberto Guerrero

18   standing by his gray car with Rudiberto Guerrero's red truck parked beside his son's car.

19   Alberto Guerrero got in his car and left followed by the red truck.  As the vehicles drove away,

20   she ran over to where Monpie had been standing; and she found him on the ground covered

21   in blood and with no pulse.[11]

22   Maria Maldonado similarly testified that she knew the Guerreros and was familiar with

23   their vehicles.  According to Maldonado's trial testimony, she saw Alberto Guerrero's car

24   parked on the street as she opened the door for her mother.  As her mother and siblings were

25   coming into the house, she saw Guerrero get out of his vehicle, start walking toward Monpie,

26   and begin talking to him.  Maldonado and Dacosta went to the bedroom at the front of the

27

28        [11]*Trial Transcript for January 13, 1998*, at 80-82, 85-101, 105-10 & 116-33.

-13-

house to look at Christmas presents.  While they were talking, they heard a popping sound like a gunshot; and Maldonado looked outside the window from her vantage point to see Alberto Guerrero firing a handgun, making two more popping sounds.  She then saw Rudiberto Guerrero pull up behind his son's car in his truck, exit the vehicle, and fire a shotgun three times, with a loud booming noise, in the same direction that Alberto had been firing.  Although she could not see Monpie at the time, she shouted to her mother "oh my god, Mom, Albertico and Rudy are killing Manolo", which is what she called Manuel Monpie.[12]

Maldonado and Dacosta ran outside of the house, with Maldonado stopping just outside the front door.  She looked at Rudiberto Guerrero to be sure that it was him.  She saw him going toward his vehicle while saying to his son "vamanos."  The two men then left in their vehicles.  She recalled Rudiberto Guerrero leaving in his red truck first, followed by Alberto Guerrero in his gray car.  She saw the two vehicles split off and go in different directions. Maldonado and Dacosta then found Monpie's body lying on the ground.  The Guerreros had been firing in the direction where the two women found Monpie's body.[13]

Charles Miller lived directly next door.  According to his testimony, immediately prior to the shooting, he was in his living room engaged in conversation with his sister-in-law.  They had the volume down on the television because his wife was sleeping prior to working the night shift.  They heard some people talking outside while they were conversing, but they only heard the general sound of voices.  They then heard shots from what Miller believed to be a pistol followed by a shotgun.  He heard four to five popping sounding shots in rapid succession, a pause, and then a boom followed by an echo.  He next heard two vehicles speed away.  He did not recall hearing the sound of vehicle doors shutting.[14]

Miller heard female voices crying for held outside, and he called 911.  He looked outside and saw Dacosta and Maldonado standing by Monpie's body still crying for help, so

_____

[12]*Trial Transcript for January 13, 1998*, at 134-48, 152-54, 156, 165-67, 170-72, 176-84 & 196-98.

[13]*Id.*, at 148-51, 184-94 & 196.

[14]*Id.*, at 198-201 & 204-06.

he called 911 again.  By the time that he made it back to the front door, the police already had arrived.  When he went outside, he saw Monpie laying on the ground; and he did not appear to be breathing.  Less than five minutes elapsed between the time that Miller heard the shots and the time that the police arrived.[15]

Jose Bustillos lived about four houses away on a connecting street, with a line of sight to the scene of the shooting.  Monpie lived on David Avenue and Bustillos lived on North 18th Street.  According to his testimony, Bustillo heard three or four gunshots with one sounding stronger.  He went outside because he heard the women crying.  As he stepped out of his house, he saw a red truck "taking off" on David Avenue and heading toward Bustillo's house.  The red truck was being driven by a solitary male that Bustillos believed to be Hispanic.[16]

Two to three minutes after the red truck drove off, but not less than two minutes later, Bustillos saw a gray medium car with two male occupants come down North 18th Street.  The vehicle made a semi-stop right in front of Bustillo's home; the two men looked down David Avenue to where the shots had come from, where the women were crying; and then the vehicle left.  Bustillo thought that the car was suspicious, and he took down the license plate number.  He gave the license plate number to the police with a statement as to what he saw.  The police did not contact him again thereafter with regard to the vehicle.[17]

Bustillos never saw the gray medium car traveling on David Avenue at any time.  He testified that he thought that the vehicle was suspicious because the two men slowed down and looked.  He stated that the driver "just stopped there for a second and he turned, and that was all."  Bustillos acknowledged that it would not have been unusual for someone to look in the direction of the shooting in the circumstances.[18]

/ / / /

---

[15]*Trial Transcript for January 13, 1998*, at 201-03 & 205.

[16]*Trial Transcript for January 15, 1998*, at 115-18, 121-23 & 125-27.

[17]*Id.*, at 117-24.

[18]*Id.*, at 121 & 123-25.

-15-

Bustillos did not testify that he saw the gray medium car prior to the shooting; he did not testify that he saw the car at the time of the shooting; and, indeed, he did not testify that he was an eyewitness to the shooting itself.  The first vehicle that Bustillos saw after he heard the shooting was a red truck driven by a solitary Hispanic male leaving from the area of the shooting on David Avenue.  This vehicle, description, and time frame corresponded to Rudiberto Guerrero's departure from the scene of the shooting in his red truck immediately after Monpie was gunned down.  Thus, it was a Guerrero vehicle, and not a mystery white vehicle, that Bustillos saw coming from the area of the shooting when he first observed the scene shortly after hearing the gunshots.

At the state post-conviction evidentiary hearing, petitioner's trial counsel testified that the defense investigation found no credible evidence that the victim was killed in a drive-by shooting in which an armed Monpie exchanged gunfire with the occupants of a white vehicle at the same time that the Guerreros arrived.  According to Kennedy's testimony, the petitioner's allegations -- including the allegations regarding the victim's alleged propensity for violence, his alleged gang affiliation, and Guerrero's claimed reason for going to the Monpie  residence – all were belied by the investigation conducted and the evidence in the case.  The defense investigation included review of the extensive police investigation file, the statements from the victims, and the discovery in the case, together with discussions with petitioner and his family.  There was no credible evidence tending to establish that Monpie was gunned down in a drive-by shooting by the occupants of a white vehicle.  Kennedy further noted the ballistic and forensic evidence establishing that Monpie's wounds came exclusively from bullets from Alberto Guerrero's .22 and from shotgun projectiles matching the shotgun shells in Rudiberto Guerrero's possession at the time of his arrest.  Counsel made a tactical decision to not "go off on that tangent" because there "simply was no credible evidence" to support the theory.[19]

/ / / /

_____

[19]*Evidentiary Hearing Transcript for February 20, 2003*, at 7-11, 17-18, 28-33 & 38-39 (filed with #12).

-16-

The state district judge engaged in an extensive colloquy with the petitioner on the claim at the evidentiary hearing.  While the colloquy is too lengthy to set forth herein, the exchange is instructive.  The state district judge gave the petitioner multiple opportunities to answer the question:  "How did this white car containing these individuals drive by and shoot this person with your .22?"  Petitioner never was able to give a coherent answer that presented a rational picture as to how the drive-by shooting scenario occurred in a manner that was consistent with the physical evidence.[20]

Guerrero did not come forward with any evidence at the evidentiary hearing tending to establish that defense counsel would have been able to support the drive-by shooting theory with credible evidence if he had pursued the issue further.  In particular, petitioner did not come forward with any testimony by any actual neighbors asserting that they were eyewitnesses to an alleged drive-by shooting.

Petitioner referred only to the testimony at trial of a Hispanic man, "Jose something," who allegedly testified about the white car and obtained a license plate number.[21]  Petitioner apparently was referring to the testimony of Jose Bustillos.  As summarized above, however, Bustillos testified only that he took down the license plate number of a gray medium car that he thought was suspicious.  He was not an eyewitness to an alleged drive-by shooting.

Guerrero thus presented no evidence establishing what defense counsel allegedly would have discovered if he had conducted further investigation, and he failed to present any evidence that a single neighbor in fact would have testified that they witnessed a drive-by shooting. His central allegation that an adequate defense investigation would have developed such eyewitness testimony by neighbors therefore was wholly unsupported and speculative. His remaining allegations on the claim similarly were unsupported.

In assigning oral reasons, the state district court judge noted that the petitioner had failed to provide a coherent explanation as to how the use of his .22 in the shooting fit in with

---

[20]*Evidentiary Hearing Transcript for February 20, 2003*, at 34-38.

[21]*Id.*, at 39-41.

1    the mystery white car.  The court observed that a theory that could not even be coherently

2    explained in the post-conviction setting would not likely have persuaded a jury at trial.  The

3    court concluded that trial counsel had not rendered deficient performance and denied the

4    petition.[22]

5         In subsequent written findings and conclusions, the state district court found that

6    Guerrero had not shown that defense counsel's performance was deficient or that any such

7    deficiency actually prejudiced the defense.[23]

8         The Supreme Court of Nevada held as follows on this claim:

9                    . . . Alberto contended that his trial counsel was ineffective
          for failing to investigate whether Monpie was killed by a person in
10         a white car as part of a drive-by shooting.  The record reveals that
          a witness was called to testify on behalf of the defense by
11         Rudiberto's trial counsel, Sciscento.  This witness testified that he
          observed a suspicious gray vehicle with two occupants in
12         Monpie's neighborhood just after he heard gunshots on the night
          Monpie was killed.  Alberto failed to support this allegation with
13         any specific facts showing that a more thorough investigation of
          this issue would have been reasonably likely to reveal any
14         information or additional witnesses that would have altered the
          outcome of his trial.  Therefore, the district court did not err by
15         denying Alberto relief on this allegation.

16   *March 25, 2004, Order of Affirmance*, at 4-5 (filed with #12)(citation footnote omitted).

17        Following review of the trial and evidentiary hearing testimony and proceedings

18   summarized above, this Court has no difficulty holding that the Nevada Supreme Court's

19   rejection of this claim was neither contrary to nor an unreasonable application of *Strickland*.

20   The petitioner's claim, which strains credulity on its face, was unsupported by any competent

21   evidence tending to establish that there was a reasonable probability that the outcome of the

22   trial would have been different had defense counsel investigated petitioner's drive-by story

23   further.  The story further was not capable of being explained coherently and rationally in a

24   manner that was not contradicted and belied by the physical evidence presented.

25        Ground 1(b) accordingly does not provide a basis for federal habeas relief.

26   _____

27        [22]*Evidentiary Hearing Transcript for February 20, 2003*, at 45-47.

28        [23]*March 28, 2003, Findings of Fact, Conclusions of Law and Order* (filed with #12).

-18-

***Ground 2(a):  Failure to Cross-Examine Witnesses Regarding the Victim's Alleged Propensity for Violence, Carrying of a Handgun, and Gang Involvement***

The allegations of Ground 2(a)[24] are closely intertwined with the allegations of Ground 1(b) and also are grounded in the petitioner's core underlying contention that counsel was ineffective for failing to develop a drive-by shooting defense theory.  The Court accordingly adopts the preceding discussion of the trial and evidentiary hearing testimony and proceedings regarding Ground 1(b) with regard to Ground 2(a) as well.

In Ground 2(a), petitioner contends that he was denied effective assistance of counsel because his counsel failed to cross-examine the State's witnesses regarding the victim's alleged propensity for violence, habitual possession of a handgun, and involvement with gang violence.  Petitioner alleges that, "[w]ith the inclusion of this evidence the defense could have proven that the death of Monpie was the result of his propensity for violence as a member of a violent neighborhood street-gang which precipitated a planned drive-by shooting against which Monpie returned fire with the 'missing' handgun he always carried, presumably for his own protection against this type of violent attack."  #8, at 5-5(a).

At the state post-conviction evidentiary hearing, petitioner's trial counsel testified that there was no evidence that Monpie possessed a handgun or that he was a member of a gang.  He further did not believe that it was a good tactic to attack the dead victim at trial in the face of evidence, *inter alia*, that he was shot multiple times with Alberto Guerrero's .22, because the strategy could backfire and turn the jury against the defense.[25]

Guerrero did not come forward with any evidence at the evidentiary hearing tending to establish that, if defense counsel had inquired on cross-examination, any State witness in fact would have testified that Monpie had a propensity for violence, habitually carried a handgun, or was involved with gangs.

---

[24]The Court has subdivided Ground 2 into parts (a) and (b) because the claim also includes a claim that counsel was ineffective for refusing to allow petitioner to testify.

[25]*Evidentiary Hearing Transcript for February 20, 2003*, at 8, 11, 16-18 & 28-32 (filed with #12).

1    The Supreme Court of Nevada rejected both this claim and a related claim alleging a

2   failure to investigate the underlying factual allegations.

3    The state high court held as follows on the related failure-to-investigate claim:

4           . . . Alberto contended that his trial counsel was ineffective
    for failing to conduct a meaningful pre-trial investigation into the
5           following issues: whether the victim, Manuel Monpie, was a
    violent gang member who had many enemies; whether Monpie
6           physically abused his girlfriend, Elsa Dacosta; whether Monpie
    carried a handgun and returned gunfire on the night he was killed;
7           and whether Dacosta hid Monpie's handgun from the police.

8           . . . . Alberto failed to support these allegations with any
    specific facts showing that he was entitled to relief.  Moreover,
9           Kennedy testified at the evidentiary hearing held on Alberto's
    petition that he did not have any information that Monpie was a
10          gang member who had many enemies, or was even in
    possession of a gun on the night that he was killed.  Kennedy
11          also testified that he did not believe that it was a good trial
    strategy to present bad character evidence of a victim in a
12          criminal case.  Alberto failed to show that Kennedy's tactical
    decision was unreasonable. Given that Rudiberto's trial counsel,
13          Joseph Sciscento, cross-examined Dacosta regarding Monpie's
    propensity for violence [in striking her on one occasion], the jury
14          nonetheless heard this evidence and Alberto cannot show any
    prejudice by any failure in his trial counsel's performance with
15          respect to this issue.

16          . . . . Alberto failed to show how a more thorough
    investigation of these issues by Kennedy wold have revealed any
17          information so convincing that it would have been reasonably
    likely to alter the jury's verdict.  Therefore, the district court did not
18          err in denying Alberto relief on these allegations.

19   *March 25, 2004, Order of Affirmance*, at 3-4 (filed with #12)(citation footnotes omitted).

20    The Nevada Supreme Court held as follows on the present claim for failure to cross-

21   examine the State witnesses on the same factual allegations:

22          . . . Alberto contended that his trial counsel was ineffective
    for failing to properly cross-examine various State witnesses
23          regarding the following issues: whether Monpie was affiliated with
    a gang, whether Monpie carried a handgun, and whether Monpie
24          had a propensity for violence.  The record reveals that twenty
    witnesses were called by the State to testify during trial.  Fourteen
25          of these witnesses were cross-examined by Kennedy.  As
    previously discussed, there was no testimony linking Monpie to a
26          gang or showing that he was in possession of a gun on the night
    that he was killed.  Rather, all six of the witnesses who were at
27          the crime scene on the night Monpie was killed testified that they
    observed no weapons in Monpie's possession.  Alberto failed to
28          specify how any additional cross-examination of the State's

-20-

1
2

> witnesses would have altered the outcome of his trial in any way.
> Therefore, the district court did not err in denying Albert relief on
> this allegation.

3 *March 25, 2004, Order of Affirmance*, at 3-4 (filed with #12)(citation footnotes omitted).

4       The Nevada Supreme Court's rejection of this claim was neither contrary to nor an

5 unreasonable application of *Strickland*. The petitioner's claim was based on the wholly

6 speculative premise that cross-examination of the State's witnesses would have elicited

7 favorable defense testimony on these points in the absence of any other evidence that the

8 victim had a propensity for violence, carried a gun, or was involved with gangs.[26] Further, the

9 claim was part and parcel of Guerrero's drive-by shooting theory of defense, a theory that, at

10 best, strained credulity, and, at worst, was directly contradicted by the undisputed physical

11 evidence.

12       Ground 2(a) accordingly does not provide a basis for federal habeas relief.

13       ***Ground 2(b): Alleged Refusal to Allow Petitioner to Testify at Trial***

14       In Ground 2(b), petitioner contends that he was denied effective assistance of counsel

15 because his counsel allegedly refused to allow him to testify at trial. Guerrero alleges that he

16 "demanded to be called to the stand to testify on his own behalf, to describe the events

17 including the drive-by which took the life of the victim as well as the victim's propensity for

18 violence, the gun that the victim carried the night he was assassinated like all previous nights,

19 the street gang violence which was a constant companion for the victim and his fellow gang

20 members." He maintains that his counsel refused to allow him to take the stand to present

21 this testimony. #8, at 5(a).

22       At trial, outside the presence of the jury, the state trial judge advised the Guerreros

23 shortly before the close of the State's case as to both their right to remain silent and their

24 ability to instead waive this right and take the stand. Each defendant put on one witness and

25 then rested. Alberto Guerrero did not indicate at any point during the trial proceedings that

26

27
28

    [26]The improbability that blind defense cross-examination of the State's witnesses on these points would have yielded positive results is reflected in Sciscentos' cross-examination of Elsa Dacosta. When he asked her on cross-examination whether she had ever seen Monpie with a handgun, she testified "no." *Trial Transcript for January 13, 1998*, at 129-31.

1   he wanted to testify or that he was being prevented from doing so by his trial counsel.  Even

2   during his outburst in the penalty phase closing arguments, necessarily after the jury had

3   rendered a verdict finding him guilty, Guerrero did not state that he wanted to testify or that

4   he had been prevented from testifying by counsel.[27]

5        At the state post-conviction evidentiary hearing, Guerrero's trial counsel testified that

6   he advised petitioner to not testify.  He denied "twisting his arm" or threatening Guerrero in

7   any way.  Guerrero did not provide any testimony to the contrary, other than to state that

8   Kennedy never showed up at the county jail to get him ready to testify.[28]

9        The Supreme Court of Nevada rejected this claim on the following basis:

10           . . . Alberto contended that his trial counsel was ineffective
        for preventing him from testifying in his own defense.  The record
11       reveals, however, that the district court advised Alberto outside
        the presence of the jury on his right to remain silent and not
12       testify.  The district court also questioned Alberto to ensure that
        he understood the consequences of any decision he made
13       regarding this issue.  Alberto indicated that he understood his
        rights.  There was no indication from the record that Alberto was
14       improperly prevented from testifying in his own defense.
        Kennedy did testify at the evidentiary hearing that he advised
15       Alberto not to testify in his own defense.  Alberto failed to show
        that this advice was unreasonable.  Therefore, the district court
16       did not err by denying Alberto relief on this allegation.

17   March 25, 2004, Order of Affirmance, at 6-7 (filed with #12)(citation footnote omitted).

18        The Nevada Supreme Court's rejection of this claim was neither contrary to nor an

19   unreasonable application of Strickland.

20        At the outset, the rule of deferential review of state court factual findings applies to

21   factual findings by state appellate courts as well as to findings by state trial courts.  See,e.g.,

22   Little v. Crawford, 449 F.3d 1075, 1077 n.1 (9th Cir. 2006).  The state high court determined

23   that there was no indication in the record that petitioner had been improperly prevented from

24   testifying in his own defense.  Petitioner has not identified any contrary evidence in the state

25

26      [27]Trial Transcript for January 15, 1998, at 54-57 & 141; Penalty Hearing Transcript for January 20,
27   1998, at 25-30.

28      [28]Evidentiary Hearing Transcript for February 20, 2003, at 11-14 (filed with #12).

-22-

1    court record, and the Nevada Supreme Court's factual finding therefore is entitled to a

2    presumption of correctness under 28 U.S.C. § 2254(e)(1).

3        Moreover, the rule in the Ninth Circuit is that a knowing and voluntary waiver of the

4    right to testify is presumed when a defendant sits silently by when his attorney does not call

5    him during the defense case-in-chief:

6

7            [W]hile waiver of the right to testify must be knowing and
        voluntary, it need not be explicit.  [*United States v. Joelson*, 7
        F.3d 174, 177 (9th Cir.1993).]  A defendant is "presumed to

8        assent to his attorney's tactical decision not to have him testify."
        *Id*.   The district court has no duty to affirmatively inform

9        defendants of their right to testify, or to inquire whether they wish
        to exercise that right.  *United States v. Edwards*, 897 F.2d 445,

10       447 (9th Cir.1990); *United States v. Martinez*, 883 F.2d 750, 760
        (9th Cir.1989), *vacated on other grounds*, 928 F.2d 1470 (9th

11       Cir.1991). "[W]aiver of the right to testify may be inferred from the
        defendant's conduct and is presumed from the defendant's failure

12       to testify or notify the court of his desire to do so."  *Joelson*, 7
        F.3d at 177.  A defendant who wants to reject his attorney's

13       advice and take the stand may do so "by insisting on testifying,
        speaking to the court, or discharging his lawyer." *Id*. When a

14       defendant remains "silent in the face of his attorney's decision not
        to call him as a witness," he waives the right to testify. *United*

15       *States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir.1993).

16              . . . . Clearly, if the defendant says nothing until after the
        verdict has been read, the right has been waived. *Edwards*, 897

17       F.2d at 446.

18   *United States v. Pino-Noriega*, 189 F.3d 1089, 1094-95 (9th Cir. 1999).  Guerrero sat silently

19   by during trial and he made no claim on the record that he allegedly instead wished to testify

20   at trial until well after the fact when he sought post-conviction review.

21       Finally, there is not a reasonable probability that the outcome of the trial would have

22   been better for Guerrero if he had taken the stand and told his drive-by shooting story to the

23   jury.  As discussed more fully above with regard to Grounds 1(b) and 2(a), the story, at best,

24   strained credulity, and, at worst, was directly contradicted by the undisputed physical

25   evidence.  Petitioner could not even give a coherent and rational explanation to the state court

26   judge at the post-conviction evidentiary hearing as to how the drive-by shooting scenario

27   occurred in a manner that was consistent with the fact that Manuel Monpie was shot multiple

28   times with Guerrero's .22.  The far more probable outcome had Guerrero taken the stand at

1    trial with this implausible story is that the prosecutor would have wholly discredited the story

2    on what would have been a much more rigorous cross-examination, making petitioner look

3    both unworthy of belief and guilty and resulting in Guerrero losing any credibility and

4    sympathy with the jury.  In that event, he likely not only would have been convicted of first

5    degree murder but further could well have received a harsher sentence in the penalty phase.

6    Petitioner therefore cannot establish that he was prejudiced by any alleged efforts by defense

7    counsel to keep him off the stand with his inherently flawed drive-by shooting story.

8         Ground 2(b) accordingly does not provide a basis for federal habeas relief.[29]

9    ***Ground 3:  Failure to Move to Suppress Maria Maldonado's Testimony***

10        In Ground 3, petitioner contends that he was denied effective assistance of counsel

11   because his counsel failed to move to suppress Maria Maldonado's testimony on the basis

12   that her testimony was unreliable.    Petitioner maintains that a motion to suppress

13   Maldonado's testimony would have been granted because she changed her account of what

14   happened over the course of the case and further because she had a substantial reason to

15   fabricate allegations against him due to her close relationship with the victim, who had been

16   supporting her mother.  Guerrero urges that if Maldonado's untrustworthy testimony had been

17   suppressed, then the police would have had to make a more thorough investigation and

18   would have discovered unnamed witnesses who observed the alleged drive-by shooting.

19        The trial transcript reflects that both defense counsel cross-examined Maldanodo

20   extensively regarding the variances between her original statement and her trial testimony.

21   Her close relationships both with the victim and with her mother also were evident from the

22   record at trial.[30]

23

24        [29]*Accord Horton v. Mayle*, 408 F.3d 570, 577 (9th Cir. 2005)(an ineffective assistance claim based

25   upon advice to not testify was rejected where the petitioner gave no signal at trial that he wanted to testify and
     it further would be speculation to say that the outcome would have been different); *Dows v. Wood*, 211 F.3d

26   480, 487 (9th Cir. 2000)(an ineffective assistance claim alleging that defense counsel threatened to walk out if
     the petitioner testified was rejected where the petitioner never indicated during the trial that he wanted to

27   testify and he could not demonstrate resulting prejudice).

28        [30]*Trial Transcript for January 13, 1998*, at 134-35, 158-69, 174-75 & 187-94.

-24-

1    At the state post-conviction evidentiary hearing, Kennedy testified that he did not file

2  a motion to suppress Maldonado's testimony because he did not believe that there was a

3  legal basis for the motion, which would have been denied automatically by the presiding trial

4  judge.  He further noted that it was more effective to expose the inconsistencies in front of the

5  jury during cross-examination.  The state district judge hearing the post-conviction petition

6  further stated from the bench that there was no legal basis for the motion.[31]

7    The Supreme Court of Nevada rejected this claim on the following basis:

8
9                . . . Alberto contended that his trial counsel was ineffective
     for failing to suppress the testimony of an eyewitness to the
10    crime.   Specifically, Alberto contended that the eyewitness
     committed perjury by giving conflicting versions of what transpired
     on the night that Monpie was killed.  Alberto, however, failed to
11    name this witness in his petition or to provide specific facts
     showing that this witness' testimony constituted perjury.   The
12    transcript of the evidentiary hearing held on Alberto's petition
     indicates that Alberto may have been referring to the testimony of
13    Maria Maldonado, Dacosta's daughter, in this allegation.  Even if
     true, any conflicting testimony by Maldonado did not establish that
14    Kennedy's performance was ineffective.  Moreover, the weight
     and credibility to give witness testimony, even when that
15    testimony is conflicting, is an issue for the jury to decide.
     Kennedy cross-examined Maldonado during trial.  Alberto failed
16    to show that this cross-examination was ineffective in any way.
     Therefore, the district court did not err by denying Alberto relief on
17    this allegation.

18  *March 25, 2004, Order of Affirmance*, at 5-6 (filed with #12)(citation footnotes omitted).

19    The Nevada Supreme Court's rejection of this claim was neither contrary to nor an

20  unreasonable application of *Strickland*.  Guerrero does not cite any apposite authority holding

21  that the testimony of a witness can be excluded on a motion to suppress based upon alleged

22  variances between her trial testimony and prior statements and/or based upon her close

23  relationship with the victim or others.  Guerrero cannot cite any such authority because there

24  is no such authority.  His trial counsel did not render deficient performance by failing to file

25  such a baseless motion nor was Guerrero prejudiced as a result.

26    Ground 3 therefore does not provide a basis for federal habeas relief.

27  _____

28    [31]*Evidentiary Hearing Transcript for February 20, 2003*, at 14-16 & 25-27 (filed with #12).

-25-

***Ground 4:  Cumulative Ineffective Assistance***

In Ground 4, petitioner contends principally that he was denied effective assistance of counsel by the cumulative effect of the foregoing claims of ineffective assistance of counsel. While it is subject to some question as to whether this cumulative ineffective assistance claim was exhausted as such, the Court exercises its discretion under 28 U.S.C. § 2254(b)(2) to deny the claim on the merits.  Petitioner's ineffective assistance claims have no more merit in the aggregate than they do viewed singly.  To the further extent that the allegations of Ground 4  go beyond the allegations of the claims discussed above, the allegations are conclusory and fail to state a cognizable claim for relief.[32]  Ground 4 accordingly does not provide a basis for federal habeas relief.

IT THEREFORE IS ORDERED that the petitioner's motion (#17) for submission of the case is GRANTED.

IT FURTHER IS ORDERED that the Clerk of Court shall file into the record in this matter a copy of ## 14 and 15 from No. 2:04-cv-00453-KJD-RJJ, *Rudiberto Guerrero v. James M. Schomig*.

IT FURTHER IS ORDERED that the petition for a writ of habeas corpus shall be DENIED on the merits and that the petition shall be DISMISSED with prejudice.  The Clerk of Court shall enter final judgment accordingly in favor of respondents and against petitioner.

DATED:  January 25, 2007

_____
KENT J. DAWSON
United States District Judge

---

[32]The conclusory allegations include generic allegations that "there was no attempt to contact and interview witnesses," that "there was no effort to present a meaningful defense," that "there was no effort to place an alternate theory to the jury," that "counsel refused to pursue the truth in the case," and that "counsel allowed two innocent men to be convicted of a crime in which neither participated."